_____ FILED
ENTERED
LOGGED _____ RECEIVED

# THE UNITED STATES DISTRICT COURT

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES OF AMERICA FOR AN
ORDER AUTHORIZING THE INTERCEPTION
OF WIRE COMMUNICATIONS TO AND FROM
TELEPHONE NUMBERS 202-345-6849

AT **GREENBELT**
**CLERK U.S. DISTRICT COURT**

BY

**MISC. NO. 04-MC-195**
**FILED UNDER SEAL**



## AFFIDAVIT

Cheyvoryea Gibson, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., (hereinafter the "affiant") being duly sworn, deposes and states as follows:

## INTRODUCTION

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed by the FBI since March 2003. I am currently assigned to the Violent Crimes/Major Offender Squad, at the Washington Field Office and my responsibilities include investigation of violations of the controlled substances laws and drug-related offenses. I have been involved in numerous narcotics-related investigations. Previously, I was a Deputy Sheriff for the Hillsborough County Sheriffs Office, Tampa, Florida and was so employed for approximately seven years. During my tenure as the Hillsborough County Sheriffs Office, I spent two years in uniform patrol and five years as a narcotics detective. I have investigated in excess of



300 narcotic investigations, which have resulted in numerous arrest and convictions. I have received instruction on conducting investigations of, and have, in fact, participated in investigations involving: unlawful importation, possession with intent to distribute and distribution of controlled substances; the illegal "structuring" of financial transactions, the engaging in financial transactions to promote, disguise or conceal illegal drug trafficking and the source of the proceeds derived from it, and unlawfully engaging in monetary transactions involving the proceeds of specified unlawful activity, practices commonly referred to collectively as "money laundering," and conspiracies associated with the foregoing criminal offenses which are proscribed by 21 U.S.C. §§ 841(a)(l), 843(b), 846, 952(a) and 963; 31 U.S.C. §§ 5322 and 5324; and 18 U.S.C. §§ 371, 1956, and 1957. In the course of conducting or participating in these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing numerous search warrants and arrest warrants which have led to seizures of narcotics, firearms and other contraband.

3. Through instruction, training and participation in investigations, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and the language and terms which are used to disguise conversations about their narcotics activities. From Pxperience and training, your affiant has learned, among other things, that: (a) organizations that traffic narcotics in the Washington, D.C. (WDC) Metropolitan area are loose- knit



organizations of individuals that operate as an organized group; (b) organizations that are selling cocaine are extremely violent individuals that use acts of violence to further the narcotics trafficking for the good of the organizations; (c) in conversations they believe susceptible to interception, drug traffickers virtually never expressly refer to cocaine or other drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; and (d) narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities, because they believe that interception of cellular communications is impossible or at least more difficult; (e) narcotics distributed in large quantities and high purity are usually "cut" or diluted prior to actual street level distribution.

4. Throughout this investigation, law enforcement officers and agents have worked together to gather and record information about the illegal activities of those under investigation. This affidavit is based in part on personal knowledge derived from the participation of your affiant in this investigation and, in part, upon information and belief. As a result of my personal participation in the investigation detailed herein, through interviews with, and analyses of reports submitted by other Special Agents of the FBI, DEA and the Safe Streets Task Force Officers from the District of Columbia's Metropolitan Police Department (MPD), I am familiar with all aspects of this investigation. It is on the basis of this familiarity, and on the basis of the other information I have reviewed that I make this application.

4



5. I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts which establish the foundation for <u>obtaining</u> the authorization sought. Facts not set forth herein are not being relied upon in reaching my conclusion that an order should be issued. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the application for the interception of the wire communications.

6. Because these Task Force Officers of the Safe Streets Task Force are MPD police officers, who have been deputized by the FBI as Federal Law Enforcement Agents as noted in paragraph four (4) of this affidavit participate in the Safe Street Gang Task Force, and because their further participation will aid this investigation, it is requested that they be authorized to assist FBI agents in conducting this electronic surveillance, including monitoring, and to receive disclosure of intercepted communications. In addition, the interception of the target cellular telephones may produce a few conversations of another language other than English. As such, pursuant to Title 18, United States Code, Section 2518(5), it is requested that government personnel or other individuals operating under a contract with the federal government and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception, be authorized to assist in conducting this electronic surveillance and to receive disclosure of intercepted communications.

## TARGET OFFENSES

7. Your Affiant believes that there is probable cause to establish that communications concerning the illegal possession, or the attempted possession with the intent to distribute and the illegal distribution of controlled substances, particularly crack cocaine and cocaine HCl, in violation



of Title 21, United States Code, 841(a)(1); conspiracy to distribute and possess with intent to distribute controlled substances in violation of Title 21, United States Code, Section 846; the use of a communication facility in facilitating the commission of such narcotics offenses, in violation of Title 21, United States Code, Section 843(b); participating in continuing criminal enterprise in violation of 21 U.S.C. § 848; money laundering in violation of 18 U.S.C. § 1956, 1957, have been,

are being, and will continue to be made to and from (202) 345-6849 with International Mobile Serial Identification (IMSI) 316010004858905 which is a mobile cellular telephone with service provided by Nextel Communications, Inc. ("Nextel"), 201 Route 17 North, Rutherford, N.J., 07070, subscribed to in the name of Lenia Cash, 1526 Potomac Avenue SE, Washington, D.C.( **Target**

**Telephone** #2)' by EDWARD KENNETH **KELLY,** JR., STEVIE **BURTON,** RICHARD

DONNELL **BRISCOE,** RAY EVANS, JR.,

and others as yet unknown or unidentified

(hereinafter referred to as the **INTERCEPTEES).**

8. Further, your Affiant believes that there is probable cause to establish that the illegal possession, or the attempted possession with the intent to distribute and the illegal distribution of controlled substances, particularly crack cocaine and cocaine HCI, in violation of Title 21, United States Code, 841(a)(1); conspiracy to distribute and possess with intent to distribute controlled substances in violation of Title 21, United States Code, Section 846; the use of a communication

---

' This telephone also bea:ˑs tˍˍe urban fleet mobile identifier (UFMI) number 164* 117*42573 which is utilized to access the direct connect feature which is also referred to as the push to talk or walkie-talkie feature of the telephone.

[411 nv
ˑ/



facility in facilitating the commission of such narcotics offenses, in violation of Title 21, United States Code, Section 843(b); participating in continuing criminal enterprise in violation of 21 U.S.C. § 848; money laundering in violation of 18 U.S.C. § 1956, 1957 have been committed, are being committed, and will continue to be committed by RICHARD DONNELL **BRISCOE,**

TEVIE **BURTON,**

Baron WATKINS, a/k/a Bern, EDWARD KENNY KELLY(AKA Kenny, K), Ray EVANS Jr.(AKA Chuckie, Chuck) and others as yet unknown or unidentified (hereinafter referred to as the

**TARGET SUBJECTS).**

### DESIGNATED FACILITIES

9. Based on your affiant's investigation, and for the reasons which are set forth herein, there is probable cause to believe the **INTERCEPTEES** and others have used, are using, and will continue to use the telephone described below in connection with the above offenses. Additionally, there is probable cause to believe that evidence of such criminal communications will be obtained through the interception of wire communications to and from the target telephone.

10. Based on the affiant's investigation and for the reasons which are set forth herein, there is probable cause to believe that EDWARD KENNETH KELLY, JR., RICHARD DONNELL **BRISCOE,** STEVIE **BURTON,** RAY EVANS, JR.,

**W**nd persons as yet unknown or

not fully identified, have used, are using and will continue to use the telephones which is presently



assigned cellular telephone number (202) 345-6849 **(Target Telephone** #2), in connection with the above offenses. Additionally, there is probable cause to believe that evidence of such criminal communications will be obtained through the interceptions of wire communications made to and from those telephone numbers. **Target Telephone** #2, (202) **345-6849** with International Mobile Serial Identification (IMSI)316010004858905 is a mobile cellular telephone with service provided by Nextel:; Communications, Inc. ("Nextel"), 201 Route 17 North, Rutherford, N.J., 07070, subscribed to Lenia Cash, 1526 Potomac Avenue SE, Washington, D.C. and utilized by KELLY. It is noted that the nature of cellular telephones is such that they need not be used at any particular premises. For that reason, the exact location or premises in the metropolitan area where the abovedescribed criminal activity will be discussed over this particular cellular telephone cannot be determined with any specificity. The aforementioned address where this particular cellular telephone is subscribed is merely the name and location to which the service provider mails the billing statements. Nonetheless, the investigation detailed below has determined that KELLY and his associates are utilizing **Target Telephone** #2 to discuss and facilitate drug trafficking in the Washington, D.C., Virginia, and Maryland area.

11.     Accordingly, this affidavit is made in support of an application which seeks

authorization to intercept wire communications of the targeted interceptees and others as yet

unknown or not fully identified, including background conversations intercepted while the

telephone is activated, to and from **Target Telephone** #2. It is also requested that iti the event

that the target cellular telephone is transferred outside the territorial jurisdiction of this Court,

interceptions may take place in any other jurisdiction within the United States.



## OBJECTIVES

12. The types of communications sought to be intercepted are communications evidencing: (1) the nature, extent and methods of operation of the narcotics trafficking activities in which the interceptees and others as yet unknown are engaged; (2) the identities, roles, and telephone numbers of co-conspirators, accomplices, aiders and abettors and other participants in such illegal activity; (3) the source, distribution, transfer and location of the narcotics and money involved in those activities; (4) the existence and location of additional apartments, residences, businesses and other premises used in the furtherance of the illegal activity; (5) the existence, location and source of the resources used to finance the illegal activity; (6) the existence, location and disposition of proceeds of the activity; (7) the existence and location of any other item or means used in furtherance of those activities; (8) the dates, times, and details for the continued commission of the abovementioned offenses; and (9) other evidence necessary for successful prosecution and conviction of the above-described criminal activity. Your affiant believes that evidence concerning the above described offenses will be obtained through the interception of communications to and from **Target Telephone** #2; such communications will be admissible evidence of the commission of the abovestated offenses; and there is a reasonable likelihood such evidence will enable law enforcement to interdict a shipment of controlled substances and to ascertain the identities of, and prove beyond a reasonable doubt the guilt of, the participants in this alleged conspiracy.

## INTERCEPTEES

13. There is probable cause to believe the interceptees, and other persons as yet unknown, are committing, and will continue to commit, offenses involving drug trafficking, and acts of



violence, using wire communications and electronic communications to promote, manage, establish and carry out unlawful activity and facilitate the promotion, management, establishment and carrying on of said unlawful activity, attempts and conspiracies to commit those offenses, as set fourth in Title 18, United States Code, Section 2516, and stated above.

14. Your Affiant also reviewed the DEA, FBI and National Crime and Information Center (NCIC), Virginia Crime Information Network (VCIN) and other local history/arrest records for those individuals who are listed as INTERCEPTEES whose interceptees are expected to concern offenses specified in 18 U.S.C. 2516. The following information was obtained through those databases:

<br>

Name:                EDWARD KENNETH KELLY, Jr.
Alias:                 K, Kenny, Big K
Sex:                  Male
Date of Birth:         ████████████
SSN:                 ████████████
FBI:                 463918CA7

Last known address: 1526 Potomac, SE, Washington, DC

| DATE | CHARGE | DISPOSITION |
| --- | --- | --- |
| 09-16-83 | Theft | |
| 12-14-83 | Assault | |
| 12-22-86 | Assault w/ deadly weapon | Dismissed |
| 04-06-88 | CDS - Mfgr | |
| 07-04-90 | Assault w/ int to Murder | |
| 06-08-95 | Distribution cocaine | Guilty |

As a result of wire interceptions and surveillance(discussed later in this affidavit), KELLY has recently been identified as a source of supply for **BURTON.**

Name:                RAY EVANS Jr.
Alias:                 Chuckie



| | |
|---|---|
| Race: | Black |
| Sex: | Male |
| Date of Birth: | ██████████ |
| SSN: | ██████████ |
| FBI#: | 713334V11 |
| Last Known Address: | 12213 Parkton Court, Fort Washington, MD |

| DATE | CHARGE | DISPOSITION |
|---|---|---|
| 12-19-79 | Theft | Guilty |
| 02-02-81 | Concealment of Merchandise | Guilty |
| 09-18-81 | Theft | |
| 02-12-82 | Concealment / Shoplifting | |
| 06-17-82 | Auto Theft | Dismissed |
| | Unauthorized Use of Motor Veh. | Guilty |
| 07-02-82 | CSA - PCP | Nolle Prossed |
| 01-29-86 | Att Grand Larceny | Nolle Prossed |
| 06-05-90 | CSA - PWID Cocaine | Guilty |

Your Affiant believes that EVANS is a close associate of **BURTON's.** Based upon intercepted communications between **BRISCOE** and **BURTON,** your affiant believes that EVANS is either the owner, or associated with PRIMEKUTZ Barber Shop, located at 3662 St Barnabas Road, Suitland, Maryland. As detailed below, your Affiant further believes that EVANS is a significant distributor of cocaine HCl and crack cocaine. Surveillance has observed BURTON and EVANS together on numerous occasions in and around the area of the **St. BARNABAS DELI AND GRILL.**

| | |
|---|---|
| Name: | STEVIE **BURTON** |
| Alias: | Little Stevie |
| Race: | Black Male |
| Sex: | |
| Date of Birth: | ██████████ |
| SSN: | 481245CA4 |
| FBI#: | 3726 Swann Road, Suitland, Maryland |
| Last Known Address: | |

| DATE | CHARGE | DISPOSITION |
|---|---|---|
| | Assault-2rd Degree | Not guilty |
| | Deadly Weapon-Int/Inj | |
| 09/02/03 | Disorderly in Public | STET/No papered |
| | Resisting Arrest | |
| 10/31/97 | | |

(06)



| 03/29/93 | Handgun in vehicle | Guilty |
| | Deadly weapon - concealed (X2) | Released to another |
| | Manuf Serial # | agency |
| 07/14/92 | Handgun on person | STET/No papered |
| 12/21/86 | Disorderly Conduct | Guilty |

As set forth in the previous affidavit, various confidential witnesses have identified **BURTON** as the right hand man for **R. BRISCOE.** Your affiant believes that BURTON assists **BRISCOE** in the daily operations of his drug distribution organization and that BURTON himself is a significant distributor of cocaine HCI and crack cocaine.

Name:
Alias:                    one
Race:                    Black
Sex:                      Male
Date of Birth:
SSN:                          **aw**
FBI#:
Last Known
Address:

**DATE**                    CHARGE                    **DISPOSITION**



Through surveillance operations and intercepted telephone calls, your affiant believes that AIs lower level distributor for BURTON.

Name:

Sex:
Date of Birth:        Male
SSN:
FBI#:

Last known address:                              ,

**DATE**              **CHARGE**                **DISPOSITION**





is either the source of supply for KELLY or the money man for the source of supply for **KELLY.**

Name:
Race:
Sex:
Date of Birth:
FBI#:
Last Known Address:



DATE                    CHARGE                    DISPOSITION



Your Affiant believes that                    is a close associate of KELLY's, based upon telephone toll analysis between KELLY and -_ Your affiant also believes that
                     is a significant distributor of cocaine and crack cocaine for the RBO.
Additionally, based upon a prior DEA investigation. - 's known to traffic cocaine.

PRIOR APPLICATIONS, ;
15. On April 28, 2004, the Honorable Roger W. Titus, United States District Court Judge for the

District of Maryland, issued an order which authorized the interception of wire communications to and

from Nextel telephone number (301) 343-2009 Cellular telephone number (301) 343-2009, International

Mobile Identification Number (IMSI) 316010008396344, utilized by



0



STEVIE **BURTON,** subscribed and billed to Christopher Chatman, 3726 Swann Road, Suitland, Maryland, which is the residence of STEVIE **BURTON,** with service provided by Nextel Communications **(Target Telephone** #1). The interception of that telephone began on April 28, 2004. The listed interceptees in that order are STEVIE **BURTON** (AKA Little Stevie), RICHARD DONNELL **BRISCOE,** (AKA P, Pretty Ricky, PR, Pretty, Bones), STEVEN ANTHONY **BRISCOE,**

nd others as yet unknown or unidentified. On May 27, 2004, Judge Titus signed an order authorizing the continued interception of communications occurring over (301) 343-2009. The interceptees in the extension order are STEVIE **BURTON** (AKA Little Stevie), RICHARD DONNELL **BRISCOE,** (AKA P, Pretty Ricky, PR, Pretty, Bones), STEVEN ANTHONY **BRISCOE,**                                                                                                                           **Y**

**RAY EVANS** Jr. (AKA Chuckie, Chuck), EDWARD KENNETH **KELLY,**

others as yet unlMown or unidentified. The interception is continuing'
16. On April 1, 2, and 15, 2004, checks of the FBI, DEA and BICE Electronic Surveillance (ELSUR) indices, and databases, were completed. These checks revealed that no prior applications have been made to judges of competent jurisdiction for any order for authorization to intercept, or for approval of any interception of wire, electronic, or oral communications involving persons, facilities, or places specified herein, particularly cellular telephone number (301) 343-2009

---

2 While interceptions over this telephone have been helpful, as detailed herein, it is anticipated that interception over this telephone will terminate on or before June 27, 2004.



C&



**(Target Telephone #1),** or any other such applications involving STEVEN ANTHONY **BRISCOE,** Information relating to STEVIE **BURTON, Richard BRISCOE** and                          as located and was detailed in the April 28, 2004 and incorporated herein.

17. On May 20, 2004, May 24, 2004, May 25, 2004 , and June 8, 2004 checks of the FBI, DEA and BI(F, Electronic Surveillance (ELSUR) indices, and databases, were completed. These checks revealed that prior applications have been made to judges of competent jurisdiction for an order for authorization to intercept, or for approval of any interception of wire, electronic, or oral communications involving persons particularly such applications involving newly identified **INTERCEPTEES,** Ray EVANS Jr., Edward Kenneth **KELLY,**

18. On May 21, 2004, the DEA Washington, DC, advised that one Anthony - not further identified, was named in a previous application filed by the DEA for and order authorizing the interception of wire communications. The order was signed on June 18, 2003, by United States District Court (USDC) Judge Peter J. Messitte, of the District of Maryland, authorizing the interception for a 30day period. An extension was signed on July 16, 2003, authorizing the continued interception for an additional 30-day period.

19. On February 25, 2004, the Honorable John D. Bates of the United States District Court for the District of Columbia, entered an Order authorizing the interception of wire communications occurring over the telephones assigned the telephone numbers (240) 401-0206 and (240) 475-0806. At that time, this telephone was subscribed to Elliot Reed who is the primary of target of the investigation.



The listed Target Subjects in the March 26, 2004 extension order included Ray EVANS Jr... The T-III ran from February 25, 2004 thru April 24, 2004. EVANS was intercepted using telephone number 202528-6513. This is not the telephone number EVANS is presently using to communicate with BURTON. The Reed investigation is on-going No other listed Target Subjects in that Order are listed as **TARGET SUBJECTS** or **INTERCEPTEES** in this affidavit.

20. As set forth in the previous affidavits, on February 27, 1995, the Honorable Royce Lamberth of the United States District Court for the District of Columbia, entered an Order authorizing the interception of wire communications occurring over the telephone assigned the telephone number (917)859-8057. At that time, this telephone was subscribed to Richard **BRISCOE.** In addition to Richard **BRISCOE** and , Edward Kenneth KELLY was a listed target/interceptee. No other listed Target Subjects in that Order are listed as target subjects or interceptees in this affidavit.

21. On September19, 1994, the Honorable William B. Spellbring, Jr., Circuit Court Judge for Prince George's County, Maryland, entered an Order authorizing the interception of wire communications for a period of 30 days occurring over the telephones assigned the telephone numbers (301) 420-5773; (301) 420-5774, (301) 249-3795, (301) 814-2367, (301) 221-7357 and the digital pagers assigned the telephone numbers (202) 668-4042, (800) 503-8609. At that time, the telephones were subscribed to Edward Kenneth KELLY, Jr. and "Bank Roll Productions." "Bank Roll Productions" was a company owned and operated by KELLY. The listed Target Subject in that Order was KELLY. No other listed Target Subjects in that Order are listed as **TARGET SUBJECTS** or **INTERCEPTEES** in this affidavit. As a result of this investigation, KELLY was indicted on conspiracy to distribute cocaine and distribution of cocaine. As a result of the indictment,



KELLY was found guilty and was sentenced to approximately 40 years in prison. KELLY served approximately nine years of the aforementioned sentence.

## PROBABLE CAUSE

22.    The following documents are fully incorporated herein and therefore the information contained therein will not be repeated:

a.    The affidavit of Thomas Hickey dated April 28, 2004, made in support of an application for an Order authorizing the interception of communications occurring over cellular telephone number **(301) 343-2009( Target Telephone #1),** bearing International Mobile Subscriber Identification (IMSI) number 316010008396344, utilized by STEVIE **BURTON.**

b.    The Affidavit of Thomas Hickey dated May 27, 2004, made in support of an application authorizing the continued interception of communications occurring over **Target Telephone #1** in case number 04-MC-195.

c.    Ten Day Reports for the Interception of Wire Communications filed in Misc. No. 04-MC-195 for **Target Telephone #1.**

### A. **INTRODUCTION**

23.    Through the investigation, initiated by the DEA, FBI and WD, a narcotics distribution operation using acts of violence, to include homicide, to facilitate its operations was identified.. The organization is lead by Richard Donnell **BRISCOE,** hereinafter referred to as R **BRISCOE.** For clarity, your Affiant will refer to the targets of the investigation as the **RICHARD BRISCOE ORGANIZATION (RBO).** STEVIE **BURTON,** hereinafter referred to as **BURTON,** has been identified as one of the highest-ranking individuals within the RBO. Investigation has





established that **R. BRISCOE** manages and facilitates the distribution of crack cocaine and cocaine HCl in the Washington, D.C. and suburban Maryland area. Information detailed below shows that R **BRISCOE,** with the assistance of **BURTON** receives and distributes approximately 25-30 kilograms of cocaine HCl approximately three to four times per month. During the course of this investigation, your Affiant has determined that **R BRISCOE** owns and operates a business named, **XTRA ORDINARY COLLECTION,** a clothing store located at 3660 St. Barnabas Road, Suitland, Maryland. Source information indicates that **R BRISCOE** accrued the business during the summer of 2002. Surveillance has established that **R. BRISCOE** is at the business on an almost daily basis. A check of Verizon's account subscriber information revealed that **S. BRISCOE,** was listed on the account, d.b.a. **XTRA ORDINARY COLLECTION.** Members of the RBO have been observed during surveillance wearing articles of clothing, which bear the **XTRA ORDINARY** clothing logo, that is, "XO." Source information further indicates that the RBO has also acquired and began utilizing the **St. BARNABAS DELI AND GRILL,** located at 3674 St. Barnabas Road, Suitland, Maryland, as a central distribution/negotiation location for narcotics. According to information provided by CS #1, BURTON operates and oversees daily operations of the **St. BARNABAS DELI AND GRILL** while **R BRISCOE** oversees the daily operations of **XTRA ORDINARY COLLECTION.**

    24. As set forth in the original affidavit, submitted to this Court for authorization to

intercept communications to and from **Target Telephone #1,** a confidential source sold Cartier and

Rolex watches to **R BRISCOE** and BURTON and received partial payment in crack cocaine. The



previous *affidavits* contained information form various confidential sources, police reports and surveillance efforts which will not be repeated as it is fully incorporated herein.

### B. INTERCEPTED COMMUNICATIONS OVER TARGET TELEPHONE #1

25.     On April 28, 2004, the Honorable Roger W. Titus, United States District Judge, District of Maryland, signed an order authorizing the interception of wire communications occurring over on cellular telephone number (301) 343-2009, bearing International Mobile Subscriber Identification (IMSI) number 316010008396344, utilized by STEVIE **BURTON** and billed to Christopher Chatman, 3726 Swann Road, Suitland, Maryland (hereafter referred to as **Target Telephone #1). Target Telephone #1** is a NEXTEL telephone that is capable of receiving and placing telephone calls and communicating with other NEXTEL telephones by using the Direct Connect feature. Interception of **Target Telephone #1** includes both cellular telephone calls and Direct Connect communications. Interceptions began on April 28, 2003.

26.     On May 27, 2004, the Honorable Roger W. Titus signed an order for an extension to the original order authorizing the continuation of the interception of wire communications occurring to and from **Target Telephone #1.** As a result of this Court authorized interception of wire communications, this interception is presently ongoing

27.     There have been numerous calls between **Target Telephone** #1 and the **Target Telephone** #2 that were intercepted, and some of these calls will be summarized. Most of these intercepted conversations concerned the meeting between BURTON and KELLY and the payment of monies owed to KELLY by BURTON. The following interceptions are accompanied by



characterizations which are based upon the affiant's and other agents' experience and training, in this and other investigations to date.

28.     Activation #100, April 30, 2004, at 3:25 p.m., **Target Telephone** #2 called **Target Telephone #1** using the "Push to Talk" function on the Nextel phone. During this activation, KELLY inquired as to BURTON's whereabouts. KELLY stated that he is on Central Avenue near Addison Road. BURTON proceeded to ask KELLY if he wanted to meet him (BURTON) at Andre's Car Wash on Suitland Road. KELLY agreed. During this investigation, BURTON has met several other individuals at Andre's Car wash following these type of telephone contacts. This is believed to be a commonly used meeting location for BURTON to meet and distribute quantities of cocaine due to its location and its difficulty to conduct fixed surveillance.

29.     On May 6, 2004, at approximately 6:53pm, push-to-talk calls #446, 447, 448, and 449 were intercepted over **Target Telephone #1** and **Target Telephone** #2. During these calls, KELLY told BURTON that he wanted his money. BURTON told KELLY that he will "take care of him first thing tomorrow, everything". KELLY told BURTON that he needs to go to the bank now and take care of this because he has been waiting for fourteen days now. During these push-to-talk conversations, BURTON told KELLY that "folks were following me today". KELLY then asked what he is doing letting people following you. BURTON replied that he was looking behind him and saw people following him. Based on these communications your Affiant believes that BURTON has recently received drugs from KELLY and that BURTON owes KELLY a large amount of money.

30. On May 18, 2004, at 8:46 pm, push-to-talk #1356 was intercepted between Target Telephone #1 and **Target Telephone** #2. KELLY was still upset with BURTON because he had not been paid yet. BURTON told KELLY that he was on his way. KELLY told BURTON that he

would come to him. BURTON told KELLY that he was coming across the bridge and would be there in a minute. As a result of this call, surveillance units were able to respond to the residence of **KELLY.**

      31.     Surveillance observed a Ford pick-up truck at the residence of KELLY registered to a and also observed BURTON arrive and enter the residence. Shortly thereafter, BURTON, KELLY, and the subject believed to be xited the residence. Surveillance observed with a hard case briefcase in his possession.jWplaced the briefcase in his truck. KELLY was observed going to the trash can and throwing a bag of garbage away. KELLY anithen got in the Ford and departed the area. Surveillance was not able to keep up with $_{00}$ without being compromised, due to the speed he was traveling. BURTON departed the area in his vehicle. Based upon training and experience as well as the intercepted calls, your affiant believes that $_{Aws}$ Kelly's source or an individual associated with KELLY's source whose responsibility was to pick up the monies owed for a drug transaction.

      32.     Call 1377 was intercepted on May 19, 2004 at approx. 11:41 am between **Target Telephone #1** and **Target Telephone** #2. In this call KELLY called BURTON and asked what's going on. BURTON responded and told KELLY that he is at the restaurant. BURTON stated that he is planning on leaving to buy some things for the restaurant. KELLY reminded BURTON that they were supposed to go to "the deluxe "T" place to get the shirts." BURTON acknowledged. KELLY then asked BURTON for a favor. KELLY wants to get "three cases of...the deluxe'tshirts'... to take... to this other store." KELLY told BURTON that he is currently in New Carrollton. BURTON told KELLY to meet with him and they can rid' together. KELLY agrees and the call is ended. Your Affiant believes that this conversation is drug related and that "three cases of the deluxe

t-shirts" is a possible reference to a quantity of narcotics. As a result of this call, surveillance units responded to the area of the **St. BARNABAS DELI AND GRILL.** During this surveillance, units were unable to see if anything passed between the two individuals, but surveillance units did observe **BURTON** and KELLY meeting.

33.    Incoming telephone call 3097 was intercepted on June 2, 2004, at approximately 1:08 p.m. BURTON received the call from 410-991-2071, subscriber unknown, but the caller identified himself as Donnel. Donnel told BURTON to "tell him something good". BURTON replied that he will do something later on and that he "isn't ready yet". BURTON also stated that "he will be ready by the end of the week." Based upon training and experience, law enforcement agents believe that this call is drug related in that BURTON may not have the narcotics that Donnel is looking for, but will by the end of the week. Agents know that the word "ready" is frequently used by drug traffickers to indicate when they have drugs available to distribute or have the money to make a purchase of drugs.

34.    Incoming call 3387, a push-to-talk, was intercepted on June 3, 2004 at approximately 8:53 p.m. BURTON received the call from 165* 1049* 1507, subscribed to, and utilized by am

~~                                 - **URTON** that he is on Branch Avenue. BURTON asked where he wants to meet. ₐₘ then said "how about the same Pep Boys" to which BURTON said no. After several more locations are brought up,            and BURTON finally agree on Capitols as a meet location and state that they will be there in five minutes. Agents believe that this call is drug related due to the trouble in <u>determining</u> a meet location. BURTON wanted to feel safe from surveillance efforts before agreeing to a meet lc;,ation to conduct a transaction.

35.    Incoming telephone call 3284 was intercepted on June 3, 2004 at approximately 1:40 p.m. BURTON received the call from telephone number 202-415-8738, a pre-paid telephone utilized by Ray EVANS Jr. Previous intercepted calls near that time period revealed that EVANS was on his way to meet with BURTON. During the conversation, EVANS told BURTON that the "feds" are out near "Goodyear" and that they "threw a guy on the hood." EVANS continued to tell BURTON that they got a gun on the car and that they are going through the guy's stuff. EVANS told BURTON that they are all "feds, a whole bunch of them too", they are all in plainclothes and everything and they all have DC tags. EVANS continued and stated "all the fed cars have DC tags". EVANS then told BURTON that he is "trying to make sure it ain't nobody we know". Agents believe that the phrase "trying to make sure it ain't nobody we know" shows that the **RBO** is ready to take precautions to isolate themselves from that individual had they known him/her.

36. On June 4, 2004, at approximately 10:54 a.m incoming call number 3448, a push-totalk between BURTON and ₐw, was intercepted. **isked BURTON** where he was at, to which BURTON replied the restaurant. BURTON then told "I'm in the same position I was yesterday." Agents believe that BURTON was telling ʷwaᵗ he still did not have any

narcotics to distribute to ₙₒ At approximately 1:00 p.m., call number 3459 was intercepted between BURTON and ~. Again                     asked where **BURTON** was. BURTON replied that he was at his house, to which MWeplied "I need to holler at you". At this point, agents believed that this meeting might be a money drop and surveillance was initiated. At approximately

1:14 p.m., in call number 3463,        again utilized the push-to-talk to contact BURTON.

BURTON gave directions to MWegarding the barber shop where BURTON was located. Surveillance units were in place at this time, on the barber shop, Supreme Kutz, located in the 6300

block of Marlboro Pike, awaiting the arrival of **OW.** Incoming push-to-talk number 3467 was then

intercepted at approximately 1:26 .p.m. between ~ and BURTON. There was no conversation by

and BURTON simply told him "call someone else". There was no further

conversation from ₙₒ. Surveillance continued to follow BURTON until it was obvious by further phone

calls that BURTON was going shopping to the malls to purchase new boots. While agents do not

believe surveillance was noticed by **BURTON,** agents were unable to determine why

BURTON called off the meeting with

### C. THE DRUG SEIZURE ON JUNE 11, 2004

37.    On June 10, 2004 at approximately 8:38pm Call number 4421, an outgoing push-totalk,

was intercepted between **Target Telephone #1** and **R BRISCOE.** Call 4421 was identified through

the UFMI number 164*168932*3, subscribed to Tracie Williams, but utilized by R **BRISCOE. R.**

**BRISCOE** told BURTON "I've been trying to call you for two hours." BURTON told **R. BRISCOE**

that he was out walking the dog and left his phone in the car to charge up. **R. BRISCOE** then asked

BURTON when he was "gonna be over at the joint" to which BURTON replied ten minutes. **R**

**BRISCOE** then stated "Alright, I'll meet you there, where you going the back or the front" to which

BURTON replied "back". Shortly thereafter, surveillance placed the vehicles belonging to **R BRISCOE**

and BURTON in the parking lot in the rear of 3502 Terrace Drive, Suitland, MD. At approximately

8:58pm, surveillance observed **R. BRISCOE's** vehicle exit the area.

38.    Call number 4433, an outgoing telephone call, was intercepted on June 10, 2004

between **Target Telephone** #1 and the St. **BARNABAS DELI AND GRILL..**

answered the telephone. BURTON asked for "Bem" and was told that he was not available. Call number 4435, an incoming push-to-talk, was intercepted on June 10, 2004, at approximately 9:17pm between **Target Telephone** #1 and "Bem", now identified as Baron            Call 4435 was identified through ISMI number 316010011433092, subscribed to Tracie Williams, but utilized by            During this conversation, BURTON asked lto "go up to the mini-mart and get me a coke soda". It appeared that idid not understand the request so BURTON stated "baking". **VO10** still did not understand so BURTON then stated "baking soda". Call number 4438, an outgoing push-to-talk, was intercepted on June 10, 2004 at approximately 9:28pm between **Target Telephone #1** and UFMI 164* 168932*2, subscribed to Tracie Williams, and utilized by            told BURTON to meet him outside in two minutes. Due to the fact that the area of Terrace Drive is so congested, surveillance was not able to observe the meet.

39.   Based on the above activity, agents determined that **R. BRISCOE** delivered a quantity of cocaine to BURTON at 3502 Terrace Drive. The resulting conversations between BURTON and            regarding the baking soda, were also drug related in that baking soda is a necessary ingredient for the conversion of cocaine HCl (powder cocaine) into crack cocaine.

40.   At approximately 11:00 pm, BURTON was observed by surveillance carrying a white bag as he entered his vehicle. Surveillance then followed BURTON to the intersection of Old Silver Hill Road and Branch Avenue to the Meyer's liquor store and bar. On June 11, 2004, at approximately 12:30 pm, BURTON left the liquor store and heeded south on Old Silver Hill Road.

---

'Telephone number 202-409-3531, subscribed to ∼, is believed to be used by WATKINS. This Nextel phone bears IMSI number 316010011433092 and UFMI number of 164*168932*2. Therefore, calls 4435 and 4438 are between the same phones.

Shortly thereafter, Prince Georges County police officers performed a traffic stop on **BURTON** in the 3500 block of Old Silver Hill Road. After failing a roadside field sobriety test, **BURTON** was placed under arrest for Driving Under the Influence (DUI). Subsequent to his arrest, in addition to a positive alert by a U.S. Park Police K-9, **BURTON's** vehicle was searched.

41.     In the back passenger area of **BURTON's** minivan, officers discovered what appeared to be a kilogram of cocaine HCl,;and a heat sealed package of an unknown white substance. The kilogram of cocaine,~field tested positive. The heat sealed package was not opened but submitted to the DEA laboratory.

42.     A more thorough search of the vehicle was subsequently conducted. Agents identified a trap, that is, an area hidden in the vehicle utilized for the sole purpose of concealing weapons, drugs, and/or currency. This trap was located in the passenger side airbag. The airbag cover on the dashboard was removed by agents and revealed a large compartment in the dashboard area. The airbag had been removed by those installing this trap and the area had been made secure by using duct tape and wood. Agents dismantled the device and observed a handgun in the compartment. The handgun was removed and placed into evidence. Coffee grounds were also scattered throughout the compartment. Those that distribute narcotics believe that by putting coffee grounds in an area where narcotics are stored, will not result in a positive alert by police K-9s. The rest of the vehicle was searched and then the vehicle was parked in an area near the scene of BURTON's arrest where BURTON could pick it up after he was released. Due to the fact that the

GPS[4] was still in the van, agents believed that returning the van was more beneficial to the overall

investigation than seizing it for forfeiture or as evidence.

43.     While BURTON was being detained at the scene, he made several phone calls. Call number 4473, an incoming telephone call, was intercepted on June 11, 2004 at approximately 1:25am **between Target Telephone #1** and 202-306-3514, subscribed to Bill Hill. In that conversation, BURTON  stated "There's something in my car, bro" and "they're about to lock me up". The unknown male then asked BURTON  "You ain't got no tickets on you, do you" to which BURTON  replied "yeah one". Your affiant believes that "tickets" refers to a quantity of narcotics, in this case one kilogram of cocaine.

44.     Call number 4476, an outgoing telephone call, was intercepted on June 11, 2004 at

approximately 1:27am between **Target Telephone #1** and 301-736-4927, the home phone for 3726

Swann Road, Suitland, MD, the residence of BURTON's parents. Upon answering, **BURTON**

said "yeah". BURTON

stated "Bern". Your Affiant believes this to be

then continued and told                 They are about to lock me up for DWI" and "Somehow, I don't

know how, you got to try to call Doug. See if he can try and figure out how to get into the house".

Based upon agents believed that there were more narcotics at 3502 Terrace Drive and responded to the

area, along with Prince Georges County Police marked units.

---

[a] On May . 7, 2004, Special Agent Cheyvoryea Gibson appeared before the Honorable Jillyn Shultze, a Magistrate Judge for the District of Maryland, Southern Division. Judge Shultze signed an order authorizing the installation of the GPS unit into BURTON's  minivan. On May 20, 2004, the GPS unit was installed.



45.    Upon arriving in the vicinity of 3502 Terrace Drive, agents observes two individuals, subsequently identified as                                          arrive in a 1997 Cadillac bearing (MD) HJG-826, and enter 3502 Terrace Drive. Shortly thereafter, agents and

and uniformed Police Officers knocked on the door to 3502 Terrace Drive, Apartment

ere in the apartment and asked to step outside for questioning. Agents interviewed and **jjj~** gave written consent to search the apartment via a DEA-88, Consent to Search form at approximately 1:25 am.

46.    On June 11, 2004, at approximately 3:15 am, agents concluded the search of 3502 Terrace Drive, Apartment C. **IN"** was left with a receipt for items seized from the apartment which included approximately 750 grams of cocaine HCl, $17,642.00 in U.S. currency, two scales, a seal a meal appliance and the associated seal a meal bags, miscellaneous documents in **BURTON's** name, and a key for the apartment from BURTON's key chain. BURTON was eventually cited and released for the DUI, **BURTON** was found to been possession;.of $2,060.00 which was also seized.

were released and not charged at this time.

47.    On June 11, 2004 at approximately 10:25 am, Call number 4544, an incoming pushto-talk was intercepted between **Target Telephone** #1 and the ISMI number 316010004858905, subscribed to Lenia Cash, but utilized by Edward Kenneth KELLY which **is Target Telephone #2.** During the conversation, KELLY asked BURTON to meet him somewhere. BURTON told KELLY that he had no transportation and that he was at his house. Call number 4551, an outgoing push to talk, was intercepted on June 11, 2004 at approximately 11:04 between BURTON and

KELLY utilizing the same phone in the previous call. In this conversation, BURTON told KELLY that he now had transportattbn. The two agreed to meet at the barbershop.

48. Call number 4556, in outgoing push-to-talk, was intercepted on June 11, 2004 at approximately 11:27 a.m. between Target Telephone #1 and 116*76* 13249, subscribed to Jason Stanwood, but utilized by                    In that conversation BURTON told         `Meet me where we usually meet" to Which replied "Okay". Agents believe these to be drug related conversations in that they awd KELLY) are looking to meet with BURTON to discuss his arrest and how to cover their tracks to avoid prosecution.

## ANALYSIS OF AIR TIME RECORDS

49.As a result of the incriminating telephone calls occurring between BURTON utilizing **Target Telephone #1,** and          utilizing (202) 345-6849, **Target Telephone** #2, airtime records for Target Telephone #2 were obtained and a Dialed Number Recorder (DNR) was installed. Telephone number (202) 345-6849 **(Target Telephone** #2) is a Nextel telephone number subscribed to by LENIA CAST* of 1526 Potomac Ave, Washington, DC, 20003 but utilized by EDWARD KENNETH KELLY, a/k/a. K The following is an analysis of the cellular airtime records collected **forTarget Telephone** #2.

50. Airtime records for **Target Telephone** #2 reflect calls made during the period of time from 4/1/2004 to 6/17/2004. During this period time **Target Telephone'#2** placed or received a total of 3,886 telephone calls, of these telephone calls 2084 were incoming and 1802 outgoing.

51. During the period of time from 4/1/2004 to 5/19/2004 **Target Telephone** #2 was in contact with telephone number (301) 343-2009, **Target Telephone** #1, a total of approximately 26

times, with the last call occurring on 5/19/2004. In addition, the capture Nextel's "Push to Talk" feature for **Target Telephone #1** shows that between 12/6/2004 and 6/11/2004 **Target Telephone** #1 and **Target Telephone** #2 were in contact 451 times with the last contact made on 6/11/2004. BURTON is known to *traffic* crack and powder cocaine and is a close associate of **R BRISCOE, as** well as a member of the RBO.

52.     During the period of.time from 4/3/2004 to 6/12/2004 **Target Telephone** #2 was in contact with telephone number (202409-8120 a total of 69 times, with the last call occurring on 6/12/2004. Telephone number (202) 409-8120 is subscribed to by f 7406 Belgravia Lane, Landover, MD, 20785. In addition, **Target Telephone** #2 has in contact with telephone (301) 333-9575 at total of 49 between 4/1/2004 and 6/13/2004, with the last call occurring on 6/13/2004. Telephone number (301) 333-9575 is a hard-line telephone subscribed to bye

● of 7406 Belgravia Lane, Hyattsville, MD. However, research on this address shows that 7406

1 Belgravia Dr exists only in Hyattsville Maryland. Additionally, both sets of subscriber nformation

for                                         use the same street address and zip code, 20785, making it

very likely that                        -s the user of hard-line telephone number (301) 333-9575. Based upon the

surveillance of the KELLY and                     eeting with BURTON previously described, and the

intercepted calls of **Target Telephone #1,** your *affiant* believes a source of supply or the person handling the collection of monies for the Source of supply. Furthermore, **almwas** convicted of cocaine trafficking as a result of DEA case GD-94-0164.

53.     During the period of time from 4/1/2004 to 6/14/2004 **Target Telephone** #2 was in contact with telephone number (240) 832-6845 a total of 164 times, the last call occurring on

D

6/14/2004. Telephone number (240) 832-6845 is subscribed to by

From previous DEA investigations                          is known to traffic crack and

powder cocaine. Additionally, as set forth in the previous affidavits and given the number and nature

of calls intercepted on the **Target Telephone #1** wire intercept                          is a close associate of

**BURTON** and a member of the **RBO.**

54.    During the period of time from 4/1/2004 to 5/3/2004 **Target Telephone** #2 was in contact

with telephone number (202) 528-6513 a total of approximately 18 times, with the last call occurring on

5/3/2004. Telephone number (202) 528-6513 is subscribed to by RAY EVANS of 3662 Saint Barnabas

Rd, Suitland, MD, 20746. The address used by EVANS is the location of the **PRIME KUTZ** barber shop.

This barber shop is the location where **BURTON** delivered cocaine in October 2003, to cooperating

source in this investigation. Based upon intercepted calls and siveillance; Ray EVANS has been identified

as an associate of **BURTON's** who receives controlled substances and delivers the same for **BURTON.**

55. During the period of time from 4/8/2004 to, 5/7/2004 **Target Telephone** #2 was in contact with

telephone number (301) 655-0380 a total of approximately 17 times, with the last call occurring on 5/7/2004.

Telephone number (301) 655-0380 is subscribed to by WALTER EUGENE

f 9904 Welshire Blvd., Upper Marlboro, MD, 20774. - involvement at this time in unclear.

Through surveillance operations and intercepted telephone calls, your Affiant believes that

lower level distributor for **BURTON.**

On 5/1/2004 Target **Telephone** #2 was in contact with telephone number (202) 409

56.

of 1973 Addison

3531. This telephone number is subscribed to by

Rd, District Heights, MD, 20747 and used by Richard **BRISCOE.** It should be noted that on June 12, 2004 the 202-409-3531 phone number was changed, but not the UIPtVE or IMSI. The new number is 202-409-4602. The pen register for this phone is still receiving information, but does not show at what point the number change took effect. furthermore, the current pen register equipment does not record push to talk communications. Given the extensive use of KELLY of the push to talk feature on **Target Telephone** #2 to contact his drug associates, including BURTON, your affiant believes that KELLY is using the push to talk feature to contact **R.BRISCOE.**

57.    In addition, during the time period from 4/5/2004 to 6/17/2004 **Target Telephone** #2 has been n contact with several telephone numbers associated with other known drug traffickers,

including                                                                                                 , For example during the period of time from 4/1/2004 to 6/15/2004 **Target Telephone** #2 was in contact 214 times with telephone number (301) 996-1837 which is subscribed to by                                                                 . The last call occurred on 6/15/2004. While your affiant knows that these individuals have prior involvement in the distribution of cocaine and are in contact with **Target Telephone** #2, your affiant does not know the nature of their relationship with KELLY and therefore they have not been

identified as targets or interceptees.

### INADEQUACY OF NORMAL INVESTIGATIVE PROCEDURES

58.    Based on your Affiant's training and experience, as well as the experience of other DEA Agents, and based on all of the facts set forth;herein, it is your Affiant's belief that the




interception of wire communications is the only available technique with a reasonable likelihood of identifying the full scope of this conspiracy and securing the evidence necessary to prove that Edward Kenneth KELLY, STEVIE **BURTON,**                                      **,** STEVEN ANTHONY **BRISCOE,**

**RAY EVANS Jr.,**

and others yet unknown or not fully identified, are engaging in the aforementioned offenses, including KELLY's and BRISCOE's supply of narcotics.

## NEED FOR INTERCEPTION

59.        Based upon the experience and training of your Affiant, as well as the experience of other agents and law enforcement officers consulted, and based upon all the facts set forth herein, your Affiant believes interception of wire communications to and from **Target Telephone** #2 is the only reasonable method of developing evidence of the full scope of the suspected violations being committed by KELLY and others. This is because normal investigative procedures have been tried and have failed, and appear reasonably unlikely to succeed if continued, or are too dangerous to employ further in this investigation. Normal investigative procedures which have been employed in this investigation to date have included: law enforcement surveillance, debriefings of individuals who have been arrested in the target area or who state they have information in relation to the target area, controlled phone calls, review of pen register and air-time records for the **Target Telephone** #2, and review of various sources of public records. While this information has been helpful in proving that

an ongoing violent crime and illegal narcotics conspiracy is operating, it has not yielded sufficient evidence or revealed the full identities of the conspirators. Nor has it proven beyond a reasonable doubt the guilt of all the participants in this illegal conspiracy. This includes the persons who supply the narcotic controlled substances as well as those involved in the distribution of proceeds from these illegal activities and the conduct of violent crimes to further the operation of the organization.

60.    Based upon your Affiant's training and ex rience;-and based on your Affiant's knowledge of the facts of this investigation as set forth herein, it is your Affiant's belief that the interception of wire communications is the only available investigative technique which has a reasonable likelihood of revealing and of securing admissible evidence needed to establish the full scope and nature of the offenses being investigated.

61.    Your Affiant believes that there is a need to intercept wire communications to and from **Target Telephone** #2. During the investigation agents discovered that KELLY is a known associate of **BURTON** and **R. BRISCOE,** who is a large distributor of crack cocaine and cocaine HCl, and **Target Telephone** #2 is a tool KELLY uses to communicate with **BRISCOE,** BURTON and other associates Intercepted wire communications over **Target Telephone #1** and surveillance of **KELLY, BURTON,** and **BRISCOE** demonstrate that **Target Telephone** #2, though subscribed to Lenia Cash, is utilized by KELLY. However, they do not supply evidence of KELLY's sources ofsupply, the identities of all the co-conspirators, or other members of his customer base. Thus, only through this requested interception does it appear likely that all of the suppliers of narcotics to KELLY, and all of his co-conspirators may be fully identified and the proper evidence obtained sufficient for their prosecution

6

**OTHER INVESTIGATIVE**
**TECHNIQUES SURVEILLANCE AND**
**TRASH COVERS**

62.    Physical surveillance of KELLY, BURTON and others was frequently conducted throughout the course of this investigation and on occasions it provided valuable evidence and information in corroborating some of the information developed during this investigation. However, on many other occasions, the surveillance attempts proved to be unsuccessful. Moreover, if not used in conjunction with other techniques, to include electronic surveillance, physical surveillance is of limited value in proving beyond a reasonable doubt that subjects are engaged in drug trafficking. When physical surveillance is used in conjunction with electronic surveillance, the purpose of meeting and activities and the roles of identified associates can be made more fully understood.

63.    Although continued physical surveillance may enlarge upon the information now available, such prolonged or regular surveillance of the movements of KELLY, and other targets of this investigation, would likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and/or prosecution, or otherwise compromise the investigation. In this investigation, such a risk would be high. First, **KELLY, BURTON** and **R.** BRISCOE are plainly aware of the possibility of being observed by police. They have taken, and can be expected to continue to take, counter surveillance measures to avoid detection by law enforcement officers/agents. While the June 10-11, 2004 surveillance, which was conducted in conjunction with the interception of communications over **Target Telephone #1,** resulted in the seizure of cocaine from BURTON, it did not result in the identification of the source of supply for **R BRISCOE** or KELLY. In short, without information obtained from electronic interceptions, further surveillance would likely serve to alert the suspects of law enforcement interest in their activities.

0



64.     Several trash runs have been conducted on several of the **INTERCEPTEES** in this investigation. On many occasions during this investigation, trash run proved to be unsuccessful. The primary objective of a trash run is to attempt to find evidence of a crime being committed in that residence. For example, discarded ledgers, discarded containers, wrapping, and packaging with residue, and discarded notes to assist in the identification of others in the conspiracy. In addition to the trash run discussed in the April 28, 2004 affidavit, a trash run was completed on May 19, 2004 at 1526 Potomac Avenue, SE, Washington, DC. As a result of this run, Agents discovered a receipt to a prepaid cellular telephone in the name of Mark Jones. Agents initially believed that this might be a possible alternate telephone for KELLY. However he continues to use **Target Telephone** #2. Surveillance and items recovered from the trash indicate that KELLY is residing at this location. Further trash runs alone will not be enough to identify his suppliers, and his purchasers. In summary, further trash runs will most likely not advance the goals of the investigation in any significant way.

## COOPERATING SOURCE INFORMATION/ASSISTANCE

65.     Information obtained from CSs is not sufficient to accomplish all the goals of the investigation. Currently, CSs continue to assist the DEA and FBI in this investigation: However, none of the CSs are currently in a position to purchase narcotics directly from KELLY. CS-6 stated that it believes that it may be able to purchase crack cocaine from KELLY, but may have to go through a third party to do so. Should this occur, agents may not be in a position to observe KELLY deliver the crack cocaine to the third party but it would not led to the identification of KELLY's source of supply. Moreover, recent arrests of members of the RBO have not resulted in their cooperation, or have

resulted in BURTON's refusal to talk to the arrested target. For example, Rodney SIMMS, who is an

associated of the RBO and was employed at the St. Barnabas Deli and Grill for a period of time, was arrested in March 2004 for possession of a firearm by a convicted felon, has not expressed an interest in cooperating with law enforcement in the furtherance of this investigation.

## USE OF UNDER COVER POLICE OFFICERS

66.    The use of the undercover police officers (UCOs) is not sufficient to accomplish all the goals of the investigation. The CS's in this investigation are not in the position to introduce anyone to this organization. Even if it was possible to introduce an UCO, it is very unlikely that KELLY and/or **R. BRISCOE** would bring the UCOs inside the group or have the UCOs meet anyone that supplies him. Because the group is thought to be involved in violence, the longer the UCOs are exposed to the organization, the higher the risk of danger to the UCOs.

## SEARCH WARRANTS, INTERVIEWS, AND GRAND JURY

67.    Although your affiant has identified individuals **(BURTON, R. BRISCOE, KELLY,** and others), as well as a few locations in connection with this violent crime and narcotics distribution conspiracy, we believe the normal use of search warrants and interviews at this time would not accomplish the objectives of this investigation. The June 11, 2004 DUI arrest of **BURTON** and search of his vehicle and the Terrace Drive location demonstrate the failure of such activities to meet the objectives. While this activity resulted in the seizure of cocaine from **BURTON** and the residence it did not identify **BRISCOE's** or KELLY's sources for cocaine or the locations which they used to receive and store cocaine. At this juncture these techniques would alert the subjects to the existence of the investigation and would hamper or prevent the identification of other co-conspirators and/or the seizure of contraband. KELLY, **R. BRISCOE,** and others are conducting highly secretive illegal



operations. Because of the structure of the organization, the further execution of search warrants, the conducting of interviews, or questioning before a Grand **Jury** may cause the conspirators to become even more secretive and frustrate law enforcement efforts to obtain evidence of the ongoing criminal operation.

68.    The use of search warrants would not be likely to reveal the total scope of the illegal operations and the identities of the co-conspirators. From your Affiant's experience in this and other investigations, it is doubtful that search warrants, if obtained and executed, would result in obtaining historical records and physical evidence sufficient to show the complete extent and nature of this illegal conspiracy, particularly the source(s) of supply, the identity and roles of all co-conspirators, and the manner in which members of the conspiracy dispose of proceeds from the illegal drug business. Likewise, interviews or use of the Grand **Jury** would not likely reveal the identities of the entire organization, all of the sources of supply, or the manner in which illegally derived proceeds are disposed of or otherwise laundered.

69.    For example, on June 08, 2004, pursuant to a warrant issued by the Superior Court of the District of Columbia, a search warrant was conducted at 9 61st Street Northeast, Washington, D.C,

R A reliable source (which has been proven reliable in the
the residence of
aforementioned affidavit as CS-4), has indicated that                  being supplied by members of the RBO and is currently distributing crack cocaine for the RBO. On June 8, 2004, the search warrant was executed.. During the search of the residence agents recovered approximately 377 grams of crack cocaine, five various handguns (.40 caliber Glock with a laser sight; a Star .380 handgun, a Smith & Wesson Model 39 9mm, a Taurus PT-99 9mm, and a Astra A-100, 9mm Semi-Automatic Pistol), a

0

quantity of United States currency and various drug paraphernalia items, ammunition, and digital scales. A Field Reagent Test was conducted on the suspected crack cocaine, which tested positive for cocaine. During a post-Miranda interview,                    indicated that he was selling the cocaine for a profit, however           did not provide truthful information regarding the source of the cocaine, failed to divulge the identity of his clientele and as of this date has not to come forward to cooperate with Agents in this investigation.

### ANALYSIS OF AIR TIME RECORDS AND COURT ORDERED DNfz

70.    There is limited usefulness in the analysis of air-time records and pen register information. An analysis of air-time records and Court ordered pen registers has provided law enforcement officers with detailed information regarding the telephone numbers called by, and the telephone numbers used to call, **Target Telephone** #2. Although this information has been useful to capture relevant information, the air-time records and Court ordered pen registers fail to provide detailed, real-time, information which is needed to successfully further the objectives of this investigation. Analysis of pen register data paints in broad strokes. It allows for illustration of connections between telephone numbers, yet is less helpful in proving the actual identity of parties to a conversation. Also, data collected by pen register is not interpreted in real-time. It is frequently forwarded to field agents 24 hours after a call has commenced. Because of the delay in interpretation and the general nature of the data collected, it is not likely to completely meet the needs of fully

 identifying individuals or the means by which they traffic in illicit narcotics.

## PREVIOUS TITLE III INVESTIGATIONS

71.    In addition to the previous affidavits and court orders filed under this case number and referenced herein, your Affiant is aware of two other Title III investigations conducted by the FBI where individuals of the RICHARD BRISCOE ORGANIZATION were either surveilled or intercepted on the respective target telephones. During the court ordered HALL intercept, which was issued by the District of Columbia, beginning February 27, 2001 and ending on April 12, 2001, R **BRISCOE** was observed using HALL's monitored telephone during surveillance of a delivery of cocaine. The conversation was not intercepted because the technology to intercept the Nextel Push-toTalk was not in place. Therefore, Agents were not able to discover the nature of the meeting until after CS-2 was arrested and cooperated. Due to this, there was insufficient evidence to indict **R. BRISCOE.** In short, without information obtained from electronic interceptions, further surveillance would not disclose the nature of meetings, the identities of all his co-conspirators, or other members of his customer base, the source(s) of supply for the **RICHARD BRISCOE ORGANIZATION,** and would not disclose the full scope of the **RICHARD BRISCOE ORGANIZATION** distribution network.

72.    Thus, only through this requested interception does it appear likely that all of the suppliers of narcotics to KELLY and **BRISCOE** and all of their co-conspirators may be fully identified and the proper evidence obtained sufficient for their prosecution.

## SUMMARY

73.    While the investigation to date has determined KELLY, BURTON and R **BRISCOE** are responsible for the distribution of substantial quantities of crack cocaine and cocaine





HCl in the Washington, D.C. Metropolitan area, the investigation has been unsuccessful to date at identifying all of the primary wholesale purchasers of wholesale quantities of crack cocaine and cocaine HCI which are being distributed by KELLY, BURTON and **R BRISCOE.** Your Affiant considers identification of such wholesale purchasers as a significant objective of this investigation, particularly in view of the often violent activities associated with intermediate level trafficking groups. Further, the investigation has, as yet, failed to identify KELLY's and **R BRISCOE's** source of supply for the cocaine HCI. Identifying and subsequently prosecuting the final source of supply is a critical component of this investigation.

74.    In summary, "traditional" investigative techniques have not produced significant admissible evidence, which identifies all of the participants of the network nor the full scope and nature of this criminal conspiracy. Furthermore, the conversations have not identified source(s) of supply, all the methods used by the drug trafficking organization, and the manner in which the money generated from illegal narcotic sales is being laundered, concealed or otherwise disposed of

75. Random interviews of those named herein and others believed to be committing the offenses set forth above would not further the investigation. The named **INTERCEPTEES** and their co-conspirators are themselves criminally culpable and therefore would be unlikely to provide truthful statements. Consequently, their statements would be of little assistance to the government. Also, any interviews would likely alert the **INTERCEPTEES** and their co-conspirators about the existence of a federal investigation.

76. Your Affiant know from training, experience and discussions with other experienced agents, that individuals involved with drug trafficking frequently use cellular telephones

ht



and digital pagers to further their illicit business. Cellular telephones and digital pagers permit co-conspirators to contact each other with confidence that their communication will not be intercepted. Your Affiant believes that cellular telephones and digital pagers appear to be an important method of communication utilized by this particular criminal enterprise. Your Affiant is familiar with narcotic trafficker's methods of operation including distribution, storage and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. Affiant is aware that drug traffickers often communicate with their drug trafficking associates through the use of cellular telephones and digital pagers and their use does not restrict their movements while engaging in criminal activities.

77.     As previously mentioned above, wire communication intercepts and surveillance has disclosed that cellular telephone number (202) 345-6849 **(Target Telephone** #2), is used by <u>KELLY</u> to conduct illegal drug distribution activities. Therefore, Affiant believes that wire interception will prove valuable in identifying KELLY's, source of supply, methods of supplying drugs, and additional organizers and members of the illegal drug conspiracy.

## MONITORING AND MINIMIZATION

78.     Monitoring will be conducted by Special Agents of the FBI, DEA, MPD officers, and/or other persons acting under the supervision of the FBI and under the supervision of investigative or law enforcement officers authorized to conduct the interceptions. The FBI will monitor and minimize the intercepted communications at its Washington Field Office, located at 601 4ᵗʰ Street, N.W., Washington, D.C.

79.     All monitoring of wire communications will be <u>minimized</u> in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions






conducted pursuant to this Court's Order will be terminated upon attainment of the authorized objectives

or, in any event, at the end of thirty (30) day period run from the earlier of the date on which the law

enforcement agents begin to conduct the interception or ten (10) days from the signing of said Order.

          80.      Monitoring of an intercepted conversation will be immediately terminated when it

is determined that a conversation's subject matter is unrelated to communications subject to interception

under Chapter 119, Title 18, United States Code. Interception will be suspended immediately when it is

determined, through voice identification, physical surveillance or otherwise, that none of the named

interceptees or any of their confederates, when identified, are participants in the conversation unless it is

determined during the portion of the conversation already overheard that the conversation is criminal in

nature. Reasonable spot monitoring will be utilized to ensure that minimized calls have not become

criminal in nature. Special attention will be given to respect all privileged communications. Monitoring will

be conducted by FBI Special Agents and/or FBI Task Force Agents, under the supervision of

investigative or law enforcement officers authorized to conduct the interception. Your *affiant, as* well as

other agents and investigators participating in this interception of wire communications, will operate all

equipment necessary to monitor all calls and the FBI will maintain custody of the logs of conversations

monitored.

          81.      In the event that intercepted communications are in a code or foreign language and an
expert translator in that code or foreign language is not reasonably available during the interception period,
minimization will be accomplished as soon as practicable after such interception in accordance with Title
18, USC § 2518(5). Accordingly, in the event the translator is not a federal agent, the translator, whether a
language-trained support employee or someone under contract with the



government, will be under the direct supervision of a federal agent. If, however, such a translator is not reasonably available on the spot, the following after-the-fact minimization procedures have been established pursuant to Title 18, USC § 2518(5): (i) all such foreign language conversations will be intercepted and recorded in their entirety; and (ii) as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

### PERIOD OF TIME FOR INTERCEPTION

82.     Your affiant believes, based upon experience and the experience of other agents working on this investigation, and based upon the facts set forth herein, demonstrating a consistent course of criminal conduct over a substantial time period, that after the described communications have first been intercepted, additional communications of the same type will occur. The interception of more than one such communication will be necessary to determine the identities of the co-conspirators and to establish and understand the full extent and nature of their participation in the conspiracy and the method of its operation. For these reasons, authorization to intercept electronic communications should not be terminated upon the interception of the first described communication but should continue, until the object of the investigation is attained.

83.     The requested order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the above described offenses, or for a period of thirty days, whichever is earlier. It is requested this thirty (30) day period run from the earlier of the date on which the law enforcement agents begin to conduct the interception or ten (10) days from the signing of said Order.



## TECHNICAL ASSISTANCE

84.    Your affiant requests that, pursuant to the provisions of Title 18, USC § 2518(4), the Court order to the communications service providers, in this case Nextel Communications, will furnish to the Federal Bureau of Investigation forthwith all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with such services as that provider is according to the person whose communications are to be intercepted. Reasonable expenses incurred through the furnishing of facilities or assistance will be processed for payment by the Federal Bureau of Investigation, United States Department of Justice.

## CONCLUSION

85.    Based on all of the above your affiant submits that there is probable cause to believe that the above-described violations have occurred, are presently occurring, and will continue to occur; that **EDWARD KENNETH KELLY, JR** and others have used, are using and will continue to use the target telephone in furtherance of illicit narcotics activities; that normal investigative techniques have failed to produce evidence necessary to sustain a prosecution of the aforesaid offenses and reasonably appear unlikely to succeed.

86.    Wherefore, I believe probable cause exists for issuance of an Order to Intercept Wire Communications, and that such Order should continue to remain in effect until such interceptions

lead to the satisfaction of the specified goals of this investigation, or for a total period of thirty (30) days, whichever is earlier. It is requested this thirty (30) day period run from the earlier of the date on which the law enforcement agents begin to conduct the interception or ten (10) days from the signing

of said Order.

Cheyvo          son, Special Agent
Federal          f investigation
United States Department of Justice

SWORN TO AND SUBSCRIBED before me this ~S̲ day of June 2004.

Deborah K. Chasanow
UNTIED STATES DISTRICT JUDGE
DISTRICT OF MARYLAND

ju" 2 8 2004

in

a and W* on . l is bull. 1s Ce
';~etezl tot~9o'

Q9 ● j˜

the etiatin~

cuˢ

Deputy