## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  06-153 (RWR)** |
| | : | |
| **EDWARD KENNETH KELLY, JR.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response in opposition to Defendant's Motion to Suppress Evidence and Statements Taken in Violation of the United States Constitution (the "Motion to Suppress").  In support of this opposition, the United States relies on the following points and authorities, and such other points and authorities as may be cited at a hearing on this matter:

I.                                    **Factual Background**

The defendant has been charged in a three-count indictment with Unlawful Possession with Intent to Distribute Cocaine,  in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); Using, Carrying and Possessing A Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. §§ 924(c)(1); and Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

The indictment was the result of evidence obtained during a long-term investigation of several individuals suspected of narcotics trafficking in Prince George's County, Maryland, and surrounding areas, including Washington, D.C. By way of background to this case, in February, 2001, a federal judge in the District Court for the District of Columbia authorized a wiretap of Christopher Hall's cellular telephone (the "Hall wiretap"). Based on wire interceptions from that phone, the FBI determined that a shipment of cocaine was destined for Washington D.C. during the first week of April 2001. Based on surveillance from a prior delivery to Washington in mid-March, the FBI had a description of the Previa van that was being used to transport the cocaine. On April 7 and 8, 2001, agents in Los Angeles observed William Handy and another individual in possession of the van.

On April 11, 2001, the van was stopped by the Maryland State police outside of Frederick. The stop was based on probable cause developed from the Hall wiretap. Additionally, the troopers observed the van following another vehicle at an unsafe distance. Shortly after stopping the van, the Maryland trooper, an expert in secret compartments, noticed the van's false floor and realized it was a sign of a false compartment. A Maryland state search warrant was obtained for the van. During the execution of the warrant, the police found the secret compartment and recovered 39 kilograms of powder cocaine.

William Handy was arrested on April 11, 2001. Christopher Hall was arrested thereafter but not before he was shot in the face to prevent his cooperation with law enforcement. He survived the attack. Hall and Handy were both indicted in the District of Columbia on drug

2

trafficking charges but two trials of these two defendants and their co-defendants ended in mistrials.

Based on information developed during the Hall wiretap and investigation, an investigation was opened into Handy and Hall's primary customer, and an ultimate recipient of the cocaine, Richard Briscoe. Despite Hall and Handy's arrest, Briscoe continued his drug trafficking organization with different sources of supply through his arrest in December 2004.

On October 2, 2003, Briscoe was pulled over because his left rear brake light was not working. The car was being driven by a female friend of Briscoe, who was in the passenger seat. Briscoe was patted down for officer safety. Briscoe was advised his car was being seized for drug forfeiture as a result of the Hall wiretap. Briscoe also asked the agent whether he had sold to any particular person. The agent told Briscoe about a March 12, 2001 meeting between Hall and Briscoe. Briscoe acknowledged being at the meeting but denied there was a drug transaction. Once the car was seized, a property inventory was conducted. Agents located a loaded gun in a hidden compartment in the center console of the car.

A few weeks later, on October 25, 2003, a confidential source wearing a body wire met with Richard Briscoe, Stevie Burton and Charles Evans Ray to negotiate a transaction for stolen designer watches in exchange for crack cocaine. Briscoe paid the source $2500, as did Ray. Briscoe advised the source that he would get another $1500 and the crack later that evening. Burton delivered the 94.5 grams of crack cocaine and $1500 to the source on behalf of the three.

On April 28, 2004, the Honorable Roger W. Titus, United States District Court Judge for the District of Maryland, issued an order which authorized the interception of wire

3

communications to and from Nextel cellular telephone number (301) 343-2009, utilized by

Stevie Burton (hereinafter "Burton's Nextel phone" and the "Burton wiretap," respectively),

subscribed and billed to Christopher Chatman, 3726 Swann Road, Suitland, Maryland, a

residence used by Burton.  The interception of the Burton Nextel phone began on April 28, 2004.

On May 27, 2004, Judge Titus signed an order authorizing the continued interception of

communications occurring over the Burton Nextel phone.  Interceptions concluded on June 25,

2004, at approximately 11:00 pm.

Using information obtained from the Burton wiretap, law enforcement officers

began to conduct surveillance on June 10, 2005.   At that time, Burton and Briscoe met in the

parking lot of 3502 Terrace Dr, Suitland, Maryland.  This was a location that law enforcement

then suspected was the stash house for the Briscoe organization.  Briscoe had been trying to reach

Burton for 2 hours and the two agreed to meet later at "the back."  At 8:55 p.m., law enforcement

observed Briscoe's Black Mercedes Benz and Stevie Burton's green minivan in the parking lot to

the rear of 3502 Terrace Drive.  A few minutes later, law enforcement saw Briscoe leave.

At 9:17 p.m., the wiretap recorded a conversation between Burton and

Baron Watkins.  Burton told Watkins to "go up to the mini-mart and get me a coke soda."

Burton clarified he meant "baking soda."  Baking soda is a substance commonly used to "cut"

(i.e. increase the quantity of) powder cocaine and to "cook" powder cocaine into crack cocaine.

At 11:00 p.m., Burton left the apartment and headed to Meyer's liquor store.  Shortly thereafter,

at 12:30 a.m. on June 11, 2004, Burton left the liquor store and was pulled over for drunk

driving.  In the back passenger area, officers found one kilogram of cocaine and a heat sealed

package containing an additional 1/4 kilogram of cocaine.

4

After 1:00 a.m., law enforcement returned to 3502 Terrace Drive.  Watkins consented to a search of the apartment.  Three quarter kilograms of cocaine were found in the general living area of the apartment (kitchen and living room) as were seven boxes of baking soda used to cut and cook powder cocaine, a scale, and other drug paraphernalia.

Based on information obtained during the investigation, Special Agent Cheyvoryea Gibson of the Federal Bureau of Investigation ("FBI") applied for an order authorizing law enforcement to intercept and record telephone conversations on cellphone number (202) 345-6849, the defendant's telephone subscribed to by his girlfriend, Lenia Cash, at 1526 Potomac Avenue, S.E., Washington, D.C.  Agent Gibson's affidavit in support of the wiretap of the defendant's cellphone (the "Kelly wiretap") provided details from the recorded telephone conversations between Burton and the defendant, a known drug distributor who had been released from prison in 2002, after serving a lengthy sentence.  During the conversations, the defendant discussed money Burton owed him.[1]  The affidavit also provided information about subsequent meetings between Burton and the defendant at locations ideally suited for evading police observation.  It also stated that the ongoing investigation had led to the seizure of 750 grams of cocaine on June 11, 2004.  Based on this information, the Honorable Deborah K. Chasanow, United States District Court Judge for the District of Maryland, issued an order on June 25, 2004, which authorized the Kelly wiretap.  Interceptions began on June 29, 2004.  Judge

---

[1]  The affidavit in support of the wiretap of the defendant's phone was authored and submitted by Agent Gibson, not Agent Hickey as stated in the defendant's Motion to Suppress.  A redacted copy of the affidavit, attached here as Exhibit A, was provided to the defense in discovery on June 21, 2006.

Chasanow granted an extension on July 29, 2004, and the interceptions concluded on August 28, 2004.

As a result of the wire tap of the defendant's phone, the agents learned that on July 3, 2004, the defendant made an outgoing call to (202) 345-4416, another phone registered to Lenia Cash, which she used personally. During the conversation, the defendant instructed Ms. Cash to "get your fur from under the pillow, that one is already to go." Based on his experience, Agent Gibson believed the defendant was referring to a handgun when he used the term "fur." On July 4, 2004, the defendant made another outgoing call to Ms. Cash. During the conversation, the defendant, a convicted felon, told Ms. Cash he wanted his gun. On July 9, 2004, the defendant received a call from his friend Carl Lucas, who joked that the he was going to send his dog after the defendant. The defendant joked in response that he was not afraid of the dog because he (the defendant) would use his 9 mm out on the dog.

The wire tap concluded on August 28, 2004, and, on September 1, 2004, Special Agent Gibson applied for and obtained warrants to search the defendant's residence at 1526 Potomac Avenue, S.E., Washington, D.C., and his Lincoln Navigator, for evidence and instrumentalities of violations of the laws of the United States, specifically Title 18, Section 922(g), (the "search warrant"). In his affidavit in support of the search warrant, Agent Gibson provides details from the defendant's telephone conversations obtained through the wiretap, as described above. In addition, the affidavit relays information from a confidential informant who had known the defendant for almost his entire life. The informant observed the defendant with a handgun in November, 2002, shortly after the defendant had been released from prison after serving a felony sentence for a distribution of cocaine conviction. The informant stated that the

defendant was known to always carry firearms on his person.  Based on this information, the

search warrants were signed by United States Magistrate Judge John Facciola for the District

Court of the District of Columbia.

On September 2, 2004, pursuant to the previously obtained search warrant, a

search was conducted at the basement unit of 1526 Potomac Avenue, S.E., Washington, D.C.,

and on the defendant's Lincoln Navigator, which was parked outside the residence.  Special

Agent Carlton Peeples conducted the knock and announce on the basement door at 1526

Potomac Avenue, S.E.  After about a minute, the agents repeated "FBI, search warrant," again,

and the door was broken through at 6:37 a.m.  Present in the one-bedroom apartment were the

defendant and his girlfriend, Lenia Cash.  Agent Gibson located a backpack in the living room,

which contained two plastic bags that contained a total of 497 grams of cocaine hydrochloride.

Under the mattress in the bedroom, agents found a Glock 9mm handgun.  The gun was loaded

with 9 mm ammunition.  Agents recovered over $46,500 in U.S. currency from inside the

apartment, as well as numerous photographs of the defendant and additional documents

addressed or belonging to him.

Approximately five minutes after entry, moments after placing the defendant in

handcuffs, Special Agent Thomas Hickey of the Drug Enforcement Administration asked the

defendant if there was anything in the apartment.  The defendant's girlfriend, Lenia Cash, was in

the bedroom with other agents, and a gun had been found in the bedroom.  Without advising the

defendant of his Miranda rights, Agent Hickey asked the defendant the following question, "Is

there anything else in here we need to know about."  The defendant did not answer immediately,

but moments later informed the agents there was "coke" in the backpack.  A few minutes later,

while being escorted to the bathroom, the defendant told another agent, David Buckel, that there was a loaded gun in the bedroom, acknowledging that the firearm was his.

Later, at the FBI Office, at approximately 7:35 a.m., the defendant was advised of and waived his rights by reading the FBI "Advice of Rights" form (FD-395) aloud and completing the form by writing his initials by each line and his signature below. The defendant stated he took full responsibility for what the agents found in the apartment and that Ms. Cash was not aware of the drugs. He stated he had been consistently residing at 1526 Potomac Avenue, with Ms. Cash, for the past year. According to Ms. Cash, only she and the defendant had been living or staying at the apartment.

The defense filed its Motion to Suppress in this case arguing that the evidence should be suppress because the affidavit in support of the search warrant lacked probable cause. The defense also contends that the defendant's statements should be suppressed because they were made involuntarily and in violation of the defendant's <u>Miranda</u> rights. For the reasons that follow, the defendant's arguments are without merit and the Motion to Suppress should be denied.

**II.**          **<u>The Seized Evidence Is Admissible</u>**

A.          <u>The Search Warrant was Supported by Probable Cause.</u>

The defendant claims that there was insufficient facts to establish probable cause for the search. This claim is without merit. In evaluating whether an affidavit establishes probable cause to support a search, the reviewing court must employ the "totality of the circumstances" test set forth by <u>Illinois v. Gates</u>, 462 U.S. 213, 231-32 (1983). The Supreme Court explained that:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . concluding' that probable cause existed.

Id. at 238-39 (citations omitted); United States v. Warren, 42 F.3d 647, 652 (D.C. Cir. 1994). As the Supreme Court made clear, courts are to give "a determination of probable cause by a federal magistrate ... 'great deference.' " United States v. Hubbell, 167 F.3d 552, 559 (D.C. Cir.1999) (quoting Illinois v. Gates, 462 U.S. 213, 236 (1983)). See also Ornelas v. United States, 517 U.S. 690, 698-99 (1996); United States v. Johnson, 437 F.3d 69, 71 (D.C. Cir. 2006) (upholding finding of probable cause, finding that stale information contained in affidavit linking drug dealer to residence did not undermine showing of probable cause).

The affidavit in support of the search warrant for the defendant's residence provides ample facts establishing probable cause to believe that evidence of a crime would be found in the defendant's apartment and vehicle. As stated, the information in the affidavit was obtained in connection with the investigation of a long-term conspiracy that resulted in the indictment of the defendant and his associates in the criminal case, United States v. Richard Briscoe, et al., 04-cr-0559 (AW), in the District of Maryland. In his affidavit, Agent Gibson sets forth a long-term investigation involving the defendant, a convicted felon who had recently served a lengthy prison term for drug distribution, and his relationship to Richard Briscoe, another suspected drug trafficker. The affidavit advised that a federal judge signed an order authorizing the interception of wire communications on the defendant's cellular telephone in June 25, 2004, and that the number is subscribed to the defendant's girlfriend at the subject address, 1526 Potomac Avenue. From this fact alone, Magistrate Judge Facciola was aware that

another federal judge has made a probable cause finding that the defendant's cell phone was being used for suspected drug trafficking. Agent Gibson also summarized certain pertinent calls that he believed, based on his training and experience, reflected that the defendant was concealing a weapon at the apartment. Specifically, calls on July 3, 2004, appear to discuss the fact that the defendant was being approached by an unknown number of individuals on the street near his residence and that the defendant may have been in fear that he was about to be robbed and wanted his girlfriend to unlock his door and get his gun out. The next day, July 4, 2004, a call was intercepted in which the defendant tried to determine where his girlfriend was to determine whether she could bring him his gun from their residence.

Similarly, via a call intercepted on July 9, 2004, the affiant was able to surmise that the defendant was sitting in his car outside the home of an associate when the defendant threatened to shoot the associate's dog with his "9 mm". The affiant even advised the magistrate judge that the drug organization the defendant was being investigated for routinely utilized hidden compartments in cars to transport contraband. Finally, information from a confidential source who had been cooperating with investigators revealed that the defendant was known to carry a concealed weapon for a period of time and in fact saw him with a gun in his waistband in November 2002. Other information from the source had been corroborated where possible. Clearly there was sufficient probable cause to search the defendant's home and car for a weapon and not surprisingly, a weapon was found in the defendant's home.

The affidavit also outlines the affiant's prior experience in narcotics investigations and execution of narcotics search warrants. These facts demonstrate that narcotics traffickers routinely store narcotics, weapons, drug paraphernalia, records related to narcotics trafficking,

and other narcotics related contraband in their residence.  See United States v. Hopkins, 128 F.

Supp.2d 1, 5 (D.D.C. 2000) (recognizing as a reasonable inference that narcotics traffickers often

store items of contraband such as narcotics and narcotics paraphernalia inside their residence).

Therefore, it was reasonable to infer that such items would be found inside the defendant's

residence.  The above-referenced information provided more than sufficient evidence upon which

to issue a search warrant for the defendant's residence.

       The defendant also states that the information was too stale to support a finding of

probable cause.  This argument is based upon the fact that the intercepted calls included in the

affidavit occurred in July 2004, approximately two months before the search warrants were

executed.  It is undisputed that a valid search warrant may issue only upon facts which are so

closely related to the time of the warrant's issuance as to justify a finding of probable cause to

believe that the items will be found in the place to be searched.  Sgro v. United States, 287 U.S.

206, 210-211 (1932); United States v. McCall, 740 F.2d 1331 (4th Cir. 1984).  No set number of

days, weeks or months is required.  The issue regarding staleness is "always the same:  did the

facts alleged in the warrant furnish probable cause to believe, at the time the search was actually

conducted, that evidence of criminal activity was located at the premises searched?"  Id., at 1336.

In McCall, the court upheld a search of defendant's home based upon information which was

seven months old.  Id. at 1337.

       In analyzing this issue, the courts have repeatedly considered the nature of the

evidence sought, as well as the nature of the criminal activity.  United States v. Jones, 801 F.2d

304, 314 (8th Cir. 1986) (ongoing nature of the activity justified search seven months after

officer observed the transactions); United States v. Webster, 639 F.2d 174, 178 (4th Cir. 1981)

(protracted and continuous nature of drug trafficking render the passage of time less significant); United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972). In other words, courts will consider whether the criminal conduct is ongoing in nature or a single event which has been concluded. In the former circumstance, the significant passage of time can negate any probable cause for a subsequent search. In the case of an ongoing criminal conspiracy, as was the case in this investigation, the passage of time is less significant. See also United States v. Schaefer, 87 F.3d 562, 568 (1st Cir.1996); United States v. Dozier, 844 F.2d 701, 707 (9th Cir.1988); In re Search Warrant Dated July 4, 1977, 667 F.2d 117, 135-36 (D.C. Cir.1981). Here, a long term drug organization was under investigation, and the agent noted in the affidavit that, based on his training and experience, as well as common sense, drug dealers routinely carry weapons, both on their persons and in their homes.

Under the law cited above, there can be no question that the search warrants were based upon valid information and properly issued. In this case, the search warrant was part of a large scale investigation of the defendant and others arising out of a federally authorized wiretap. As a result, the magistrate judge did not err in determining probable cause existed for the issuance of the search warrant for the defendant's residence.

B.        Law Enforcement Relied Upon the Warrant in Good Faith.

In the event the Court were to find that there was insufficient probable cause to support issuance of the search warrant, the evidence should still be admitted at trial pursuant to the "good faith" exception to the warrant requirement set forth in United States v. Leon, 468 U.S. 897 (1984). Under the good faith exception, evidence obtained pursuant to a search warrant will not be suppressed for lack of probable cause to support the warrant unless the officers' reliance

12

upon the warrant was unreasonable or in bad faith.  Id. at 922-923; United States v. Gaston, 357

F.3d 77, 81 (D.C. Cir. 2004); United States v. Webb, 255 F.3d 890, 905 (D.C. Cir. 2001)

(applying Leon in upholding admission of evidence).  There is no evidence, and the defense does

not contend, that the officers' reliance on the search warrant for the defendant's residence was

unreasonable or otherwise in bad faith.  Accordingly, the evidence obtained during the search

should be admitted.

**III.**          **The Defendant's Statements are Admissible**

The defendant argues that any statements made by him were obtained in violation

of Miranda v. Arizona, 384 U.S. 436 (1966), or otherwise made involuntarily in violation of

Lego v. Twomey, 404 U.S. 477, 489 (1972).  The defendant's arguments are without merit.  The

statements were not obtained in violation of the defendant's Miranda rights; nor were the

statements made involuntarily.

A.          The Agents Did Not Violate the Defendant's *Miranda* Rights.

Under Miranda, custodial interrogation automatically triggers numerous

procedural safeguards to protect an individual's Fifth Amendment right against compulsory self-

incrimination.  As explained in Miranda, custodial interrogation refers to "questioning initiated

by law enforcement officers after a person has been taken into custody or otherwise deprived of

his freedom of action in any significant way."  384 U.S. at 444.  The Court has stressed that these

safeguards come into play only when the defendant is subjected to both custody and

interrogation.  Rhode Island v. Innis, 446 U.S. 291, 297 (1980); Beckwith v. United States, 425

U.S. 341, 347 (1975).  Thus, in the absence of either factor, Miranda safeguards do not apply.

1.    <u>Defendant's Pre-*Miranda* Statements are Admissible.</u>

The first statement made by the defendant in the apartment was at the time of his arrest when he informed Agent Hickey that drugs were in his backpack in the living room.  This statement was made in response to Agent Hickey's question of whether there was anything in the apartment.  At the time the defendant made this statement, he was not free to leave the scene, having been placed under arrest, in handcuffs.  Accordingly, the defendant was in police custody at the time he made this statement about the drugs.[2]  Nonetheless, the defendant's statement about the drugs given during the execution of the search warrant should not be suppressed under <u>Miranda</u> because the agents' concern for their safety permitted such limited questioning.

The Supreme Court carved out a public safety exception to the <u>Miranda</u> rule in <u>New York v. Quarles</u>, 467 U.S. 649, 655 (1984), in cases where there is "an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon." Id. at 659 n. 8.  In <u>Quarles</u>, a woman told police that she had just been raped by a man with a gun, and that he had gone into a nearby grocery store.  The police saw a man fitting the description inside the store and gave chase, but the man (the defendant) fled into the aisles.  After he was caught and frisked, the police discovered an empty shoulder holster.  The police asked where the gun was, and the defendant indicated to them where he had put it.  The Supreme

---

[2] The government submits that the defendant's second statement, i.e., that there was a loaded gun in the bedroom, was made several minutes later, and not in response to any question by the agents.  The defendant had asked the agents to use the bathroom and was escorted there by Agent Buckel, not Agent Hickey.  Agent Buckel did not ask the defendant any questions.  While on the way to the bathroom, the defendant spontaneously informed Agent Buckel that there was a loaded gun in the bedroom, acknowledging that it was his.  This statement was not obtained by means of police questioning and therefore does not implicate the defendant's <u>Miranda</u> rights. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 297 (1980); <u>Beckwith v. United States</u>, 425 U.S. 341, 347 (1975).

Court held that "Miranda warnings need not precede 'questions reasonably prompted by a concern for the public safety,' or the safety of the arresting officers." United States v. Reyes, 353 F.3d 148, 152 (2d. Cir. 2003) (quoting, Quarles, 467 U.S. at 656, 658-59). The so called "public safety" exception to the Miranda warnings requirement was carved out with the purpose of allowing "officers 'to follow their legitimate instincts when confronting situations presenting a danger to public safety,' because 'spontaneity . . . is necessarily the order of the day.'" Reyes, 353 F.3d at 152 (quoting, Quarles, 467 U.S. at 656). In setting the parameters to the public safety exception and explaining what questions are permissible in a dangerous situation, the Supreme Court stated, "We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." Quarles, 467 U.S. at 658-659 (emphasis added).

The D.C. Circuit does not appear to have addressed the applicability of the public safety exception under circumstances similar to the instant case,[3] but other Circuits have held that

_____

[3] In United States v. Brown, 449 F.3d 154 (D.C. Cir. 2006), the Court of Appeals favorably cited the Quarles decision in addressing the appellants ineffective assistance of counsel claim. In that case, the police obtained a statement from the defendant regarding the location of his gun shortly after the defendant robbed a bank. The Court of Appeals held that the statement fell under the public safety exception to Miranda, and that defense counsel's failure to raise a meritless claim was not evidence of ineffective assistance.

The United States District Court for the District of Columbia has on at least one occasion addressed the Miranda issue in a case involving similar facts. In United States v. Gorrell, 360 F. Supp.2d 48 (D.D.C 2004), the police conducted a traffic stop during which the driver was found to be driving on an expired permit. Id. at 51. The officer placed the driver under arrest, and "asked him if he had anything 'she should know about.'" Id. The driver then told the officer that he had drugs inside his pocket. Id. Judge Leon ruled that the statement was admissible, because the officer asked a "nonspecific question" that was not "reasonably likely, under the

(continued...)

the execution of search and arrest warrants can be dangerous thereby necessitating brief

questioning by law enforcement directed at ensuring the safety of those involved.  United States

v. Williams, 181 F.3d 945, 953 (8th Cir. 1999) (response to question "is there anything we need

to be aware of?" held admissible even after police had placed defendant in handcuffs and were

about to search his apartment pursuant to a warrant); United States v. Edwards, 885 F.2d 377,

384 & n. 4 (7th Cir. 1989)(statement about weapon admissible even though defendants had been

handcuffed and frisked);  United States v. Phillips, 94 Fed. Appx. 796, 801 (10th Cir. 2004)

(unpublished) (Statement admissible when police, while executing a search warrant, asked the

defendant, after he was in custody and other residents were secured, if the defendant had any

weapons and he replied that there was a shotgun in the bedroom).  See also two unpublished

Fourth Circuit opinions upholding the district court's denial of a defendant's motion to suppress

statements made in factual situations that are substantially similar to the case at bar.  United

States v. Sanderson, 23 Fed. Appx. 150, 2001 WL 1555328,(4th Cir.2001) (per curiam); United

States v. Brown, 153 F.3d 722, 1998 WL 480748 (4th Cir.1998) (per curiam).[4]

---

[3]/(...continued)
circumstances to elicit an incriminating response."  Id. at 53.  Judge Leon held that the
defendant's statement was therefore not "the product of an interrogatory question" requiring
Miranda warnings.  Id. at 54.

[4]/ The Court of Appeals for the Fourth Circuit reached the opposite result in United States v.
Mobley, 40 F.3d 688, 693 (4th Cir. 1994), a case with circumstances vastly different from the
case at bar.  In Mobley, officers conducted a security sweep of the residence, determined that
Mobley was alone, allowed him to dress, arrested him, and then Mirandized him.  Mobley asked
for a lawyer.  As the agents led Mobley away from the residence, one asked him whether there
were any guns in the house, to which Mobley responded affirmatively. Given these facts, the
Court held that the situation lacked the "immediate need," as found in Quarles, required to
invoke the public safety exception, and that Mobley's statement about the location of a gun in the
apartment should be suppressed. Id. at 693.  Clearly, the facts in the instant case are

(continued...)

The situation under which the defendant made inculpatory statements about the drugs found in the house were clearly in response to proper questioning under <u>Quarles</u>, given the need to ensure the safety of the officers.  One gun had already been found in the defendant's home, and based on the defendant's telephone conversation intercepted on July 3, 2004, the agents had reason to suspect that additional guns might be present in the apartment.  Given the tight quarters in which the agents were conducting the search, any hidden or concealed weapons could prove disastrous.  Even though the defendant answered the question by identifying narcotics in his backpack, and not a weapon, the question itself was not asked with the purpose of eliciting testimony about narcotics.  Rather, it was asked in order to uncover weapons or other dangerous items in the apartment.  The question asked by Agent Hickey in this case was appropriate under the circumstances and, therefore, the response should be admitted at trial.

    2.    <u>Defendant's Post-*Miranda* Statements are Admissible.</u>

The statements made by the defendant after he was <u>Mirandized</u> should be admitted as statements made pursuant to a knowing and voluntary waiver of his rights.  The defendant signed the Advice of Rights form after reading it aloud.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) (written waiver is "strong proof" of its validity); <u>United States v. Sledge</u>, 546 F.2d 1120, 1122  (4th Cir. 1977) ("it is not essential that the warnings required by

---

   <u>4/</u>(...continued)
distinguishable from <u>Mobley</u> because the defendant in this case did not invoke his right to counsel and the search of the residence and occupants had not been completed at the time the public safety questions were asked.  The need for answers regarding the location of potentially dangerous items remained paramount when Agent Hickey asked his question.  In <u>Mobley</u>, the need had already passed.  Indeed, the decision in <u>Mobley</u> has been distinguished in cases similar to the one at bar.  <u>Cf.</u> <u>United States v. Young</u>, 186 F.Supp. 2d 642 (E.D.Va. 2002), <u>affirmed by unpublished opinion</u>, 58 Fed.Appx. 980 (4th Cir.(Va.) Feb 11, 2003).

[Miranda] must be given in oral rather than written form."). In no way was the defendant tricked, coerced or threatened into waiving his rights. The defendant clearly understood his rights, and the Court should reject any claim to the contrary. See, e.g., Colorado v. Spring, 479 U.S. 564, 574-76 (1987) ("it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.").

Even if the Court were to conclude that Agent Hickey's questioning of the defendant violated Miranda, the question asked and answered in the apartment did not taint the defendant's subsequent Miranda waiver at the FBI station. See Oregon v. Elstad, 470 U.S. 298, 314 (1985)("[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.") In the Supreme Court's recent decision in Missouri v. Seibert, 542 U.S. 600 (2004), the Court addressed the admissibility of a confession obtained in violation of Miranda during an earlier interview, and then repeated by the accused in a later interview after Miranda warnings had been properly administered and a waiver executed. The interrogating officer in Seibert admitted that he purposefully questioned the accused without giving the proper warnings in order to elicit incriminating statements, with the expectations that he would obtain the same confession later after proper Miranda warnings had been given. Id. at 605-606.

The Supreme Court held that both the earlier confession obtained in violation of Miranda and the later post-Miranda statement were inadmissible, because the post-warnings statement was obtained under circumstances "seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes

would not have understood them to convey a message that she retained a choice about continuing to talk." Id. at 617. In evaluating the efficacy of Miranda warnings provided under such circumstances, the Court looked to several factors, such as:

> The completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 616. The Court then went on to distinguish the facts of Oregon v. Elstad, 470 U.S. 298 (1985), in which the post-Miranda statement was held admissible, noting that in Elstad the questioning at the station house was a "markedly different experience from the short conversation" at the accused's home, which could be viewed as a "new and distinct experience." Id. Conversely, the facts of Seibert consisted of a "police strategy adapted to undermine the Miranda warnings," involving station house questioning that was "systematic, exhaustive, and managed with psychological skill," and the warned phase of the questioning was conducted only 15 to 20 minutes later with no advisement of the accused that the earlier statement could not be used at trial. Id.

The facts of this case present a much different factual scenario than in Seibert. In this case, the pre-Miranda statements were made during a short conversation with the defendant while he was detained in his apartment and the agents began executing the search warrant; the post-Miranda statement was given in the formal setting of the FBI station, more than an hour after the defendant answered Agent Hickey's short question at the apartment. Even if the Court were to conclude that Agent Hickey erred by asking the defendant questions in the apartment without advising the defendant of his rights, Agent Hickey was not attempting to undermine the defendant's Miranda rights by subjecting him to "exhaustive, [and] systematic" questioning. The

defendant was essentially asked only one question at the apartment and, thus, was not subject to an interrogation where once the police "were finished there was little, if anything, of incriminating potential left unsaid." Id. Accordingly, as in Elstad, the Court should hold that the defendant's earlier statements did not undermine the validity of his knowing and intelligent Miranda waiver at the FBI station, and therefore that his post-Miranda statements are admissible.

B.                    The Defendant's Statements Were Made Voluntarily.

There is no evidence to suggest that the defendant's statements were made involuntarily. A statement is voluntary for purpose of due process so long as the statement is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (citing Columbe v. Connecticut, 367 U.S. 568, 602 (1961)). Moreover, for a statement to be involuntary, it must have been caused by government overreaching. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct casually related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). There is no indication of such conduct in this case. Moreover, even if there were, there is no indication in this case that under the totality of the circumstances, Lego v. Twomey, 404 U.S. at 489 (government has burden of establishing under preponderance of the circumstances that the confession was voluntary), defendant's will was overborne. See Rogers v. Richmond, 365 U.S. 534, 544 (1961) (government conduct must be "such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined").

In order to determine whether a statement was voluntarily made, the court must examine the totality of circumstances to determine whether an individual's "will has been overborne and

20

his capacity for self-determination critically impaired." <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 225; <u>Harris v. Dugger</u>, 874 F.2d 756, 759-62 (11th Cir.) (confession voluntary even though defendant in forearm cast and handcuffed during six-hour interrogation), <u>cert</u>. <u>denied</u>, 110 S. Ct. 573 (1989); <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will); <u>United States v. Yunis</u>, 859 F.2d 953, 961 (D.C. Cir. 1988) (defendant's seasickness, his uncomfortably hot room, and his unfamiliarity with American legal culture not a legally adequate basis for concluding that confession was involuntary); <u>United States v. Pelton</u>, 835 F.2d 1067, 1072-73 (4th Cir. 1987) (FBI agent's assertion that would launch full-scale investigation if defendant did not cooperate not sufficient to render statements involuntary), <u>cert</u>. <u>denied</u>, 486 U.S. 1010 (1988). Testimony at a pre-trial hearing in this case will demonstrate that the statements made by the defendant were voluntary.

**IV.**                                    <u>**Conclusion**</u>

  The evidence seized during the search warrant should be admitted at trial. Agent

Gibson's affidavit in support of the search warrant provides ample facts that are more than

sufficient to demonstrates probable cause necessary for the issuance of the search warrant.

Moreover, the defense does not contend that the agents acted unreasonably or in bad faith in

executing the warrant after the magistrate judge found probable cause. The defendant's

statements should also be admitted at trial because they were made voluntarily and not in

violation of his <u>Miranda</u> rights.

  WHEREFORE, the Government respectfully requests that the Court deny Defendant's

Motion to Suppress.


       Respectfully submitted,

       KENNETH L. WAINSTEIN
       United States Attorney
       Bar No. 451-058


    By:  _____
       Perham Gorji
       Assistant United States Attorney
       Delaware Bar No. 3737
       U.S. Attorney's Office
       555 4th Street, N.W., Rm. 4233
       Washington, D.C. 20530
       (202) 353-8822

**<u>Certificate of Service</u>**

I hereby certify that a copy of the United States' Response in Opposition to Defendant's Motion to Suppress Evidence and Statements, was served by first class mail upon counsel of record for the defendant, Jonathan Jeffress, Esquire, Federal Public Defender, 625 Indiana Avenue, NW, Suite 550, Washington, DC 20004,  this _____ day of July, 2006.


_____
Assistant United States Attorney

EXHIBIT A